CHARLES HAPPEL, INC., A/C MON FONG WO CO. v. UNITED STATES

**No. 8111.—**

Entry Nos. 723018; 723177; 725853; 733902.

First Division, Appellate Term

(Decided May 2, 1952)

*William Whynman* for the appellant.

*Charles J. Wagner*, Acting Assistant Attorney General (*Guy Gilbert Ribaudo*, special attorney), for the appellee.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., dissenting

MOLLISON, Judge: This is an application for the review of the decision of a single judge in a reappraisement proceeding involving the value, for duty purposes, of various shipments of sauces, etc., of the type used in the preparation of Chinese food, which were exported from Cuba during the period from December 21, 1943, to April 19, 1944.

The merchandise was entered at its invoiced values, and it is claimed by the plaintiff-appellant, both here and below, that the said values represent both foreign and export values, as defined in the statute, section 402 (c), as amended, and (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (c), (d)). The merchandise was appraised at higher unit values, which it is claimed by the defendant-appellee, both here and below, represent the export values, as defined in the statute, *supra*, of the said merchandise. The court below found in favor of the defendant's claim, and issued judgment accordingly, and plaintiff here applies for review.

Before entering upon any discussion of the specific errors assigned which form the basis of this appeal, we deem it proper to set out certain facts which appear to be undisputed and which will aid in keeping track of a somewhat complicated situation.

It appears that because of the occurrence of World War II, the normal flow of sauces, etc., from China to the United States was interrupted and that users and dealers in the United States were anxious

to develop other sources of supply. It also appears that there had migrated to Cuba from China, farmers and other persons skilled in the making of such foodstuffs and that the products of such persons found a market in the United States.

There are five types of merchandise involved herein, viz, spiced, salted soy beans (cooked black beans), soy bean sauce, plum sauce, fruit sauce, and bamboo shoots (also referred to as bamboo sauce). The shipper of the merchandise was a person named Enrique W. Chong of Havana, Cuba.

The case for the plaintiff-appellant rests largely upon an affidavit in the Spanish language, sworn to by Chong before the American consul at Havana on August 15, 1947. An English translation, found acceptable by counsel for the defendant-appellee, is appended thereto, and the affidavit and translation were received in evidence as plaintiff's collective exhibit 1 over objections by counsel for the defendant (1) that the statements contained therein "that the merchandise involved in these reappraisements was freely offered for sale to all purchasers in the ordinary course of trade, in the usual wholesale quantity" were merely conclusions of the affiant and not supported by other evidence, and (2) that the affidavit was "not sufficient to make out a *prima facie* case on behalf of the importer."

The body of the English translation of the affidavit reads as follows:

ENRIQUE W. CHONG being duly sworn, deposes and says:

I am and have been a dealer in Chinese fresh vegetables, groceries and other articles and merchandise, in Cuba for approximately thirty-five years. I also own, maintain and operate several farms where I grow the Chinese vegetables which I sell. I do not make or manufacture the soy sauces, fruit sauces and the other prepared articles or vegetables but buy these from manufacturers. I sell at wholesale and in wholesale quantities for exportation to the United States and for domestic consumption. I also sell at retail in Cuba. I am and in the past was fully acquainted with the daily market condition and prices both for export to the United States and for sale and use in Havana and other parts of Cuba. It is and was to my interest, as a merchant, to be fully cognizant of conditions, sales, terms and prices.

Prior to 1941 most of the articles and merchandise covered by the invoices herein enumerated, except fresh vegetables generally used by the Chinese, were imported from China. The trade in Cuba started to develop at the beginning of the Chinese-Japanese war and increased in volume after December, 1941.

Prior to and during the period covered by the dates of the invoices herein mentioned, I dealt, at wholesale and in wholesale quantities, in the articles enumerated on the invoices hereinafter referred to, and in other Chinese merchandise both for export to the United States and for consumption in Havana and other parts of Cuba. However I had been exporting Chinese fresh vegetables to the United States for many years prior thereto.

I have observed on many occasions the making of sauces and other articles enumerated on said invoices. I have watched each step from the beginning to the end. I am fully conversant with the making of all the products shipped by me to Mon Fong Wo of New York, N. Y.

Soy sauce is made from soy beans, salt and water. Occasionally burned sugar is added for color. From 100 pounds of beans you may make almost any quantity of sauce, which varies from 160 to 400 or more pounds, depending upon the amount of water and salt used and also depending upon the strength, color, taste and character desired. The unit cost and the subsequent selling price are controlled by the volume produced from any given quantity. Sometimes sauces are withdrawn at various stages of manufacture, thus obtaining varying degrees of quality, grade, taste, color, consistency and character. All these factors enter into the selling price. If any given batch turns out "off" in any particular respect, the price is automatically affected. Soy beans are the most expensive ingredient used. The cost of these varied from day to day. It was not unusual to have sharp fluctuations in daily prices. The purchase price of the beans automatically affected the cost of manufacture and the selling price. Large quantities were not made at any one particular time. The merchandise was made in small quantities and materials and ingredients were purchased very frequently and in fact almost daily.

The ultimate products, although made in the same way, never turned out the same, as a manufacturer rarely, if ever, uses the exact measurements, cooks the same length of time, or permits the same aging which is done partly in natural sunlight. All these factors also affect the grade, quality, taste, color, consistency and character of the product. In all my experience, I have never seen any two batches made the same way, but at different times, turn out exactly alike in every respect. Any variation affects the merchandise and the selling price as much as supply and demand. Variations in prices appearing on the invoices for the same named article, such as " soy sauce", "fruit sauce", "bamboo sauce" or other articles therein enumerated and described, are due to differences in grade, quality, color, taste, consistency and character.

After the sauces are drawn, the beans may be and are used to make cooked bean sauce. To make cooked bean sauce you wash the beans, split and mash them, add water and salt and then re-cook. However if cooked beans is the ultimate product desired, you use very little water. The kind, quality, grade, tenderness and aging of the beans affect the resultant product and the cost of the beans and consequently the selling price of the article produced.

The sauces, beans and other articles, except fresh vegetables and tobacco were trial and experimental shipments. Other dealers were also making experimental shipments to the United States and selling in Cuba in order to develop the business in Cuba and supplant China as a source of supply. There are many Chinese in Cuba who had experience with the making of such products in China. These Chinese succeeded in reaching Cuba at the outbreak and during the Chinese-Japanese war.

I sold and shipped to Mon Fong Wo, New York City, New York, U. S. A., the merchandise enumerated on the consular invoices No. 63, dated Havana, Cuba, December 1943; No. 71, dated Havana, Cuba, December, 1943; No. 2120, dated Havana, Cuba, February, 1944 and No. 6663, dated Havana, Cuba, April, 1944.

The respective prices stated on the consular invoices for the merchandise therein described, were at the time of each shipment, the market value or the price at those times for exportation of such merchandise to the United States or for sale in Havana, Cuba, which is the principal market in Cuba. Said merchandise was freely offered for sale by me to all purchasers in the ordinary course of trade in the usual wholesale quantity.

Unless otherwise specified and indicated on the invoices, the unit price included the cost of all containers and coverings of whatever nature and all other charges, costs and expenses incident to placing the merchandise in condition, packed,

ready for shipment to the United States. The sales were made f. o. b. Havana, Cuba. One hundred pounds constitutes a wholesale quantity, whether put up in tins, other packing or in bulk. The prices were calculated on the hundred pound basis. There were no variations in prices dependent on the quantity purchased. Sometimes there may have been or were slight variations in quantity due to size of barrel or container used in packing, but the weights were and are always adjusted in the same shipment or in subsequent shipments. The shipments and sales made were and are absolutely final and free sales without any restrictions of any kind or nature and in the ordinary course of trade.

The foregoing statements, facts, data and method of manufacture of soy sauces, other sauces and prepared articles apply to each and every type of article and merchandise covered by shipments above enumerated and made substantially in the same manner, except that in the making of fruit sauces some cooked beans may be added to give body and a very small amount of sugar and spices may also be added for flavor. The type of sauce made is dependent upon the type, kind, quality and character of the single fruit or mixed fruits used.

The sales made by me in Cuba for Cuban consumption, both at wholesale and at retail, were and are cash sales made over the counter.

In the determination of the issues raised in this case, the court below made the following findings with respect to the affidavit, collective exhibit 1:

This affidavit, which is unsupported by price lists or other evidences of sales or offers to sell, is entitled to little weight in and of itself. *Golding Bros. Co., Inc.* v. *United States*, 6 Cust. Ct. 964, Reap. Dec. 5272; *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093; *Transatlantic Shipping Co., Inc.* (*Absorbo Beer Pad Co., Inc.*) v. *United States*, *supra* [28 C. C. P. A. 19, C. A. D. 118]. Moreover, the veracity of the statement is open to grave doubt in view of certain documents introduced into evidence by the defendant.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In view of the contradictory statements of Enrique Wong Chong, it cannot be held that his affidavit of August 15, 1947 (plaintiff's collective exhibit 1), which is unsupported by any evidence of sales or offers to sell, is sufficient proof of the prices at which such or similar merchandise was freely offered for sale, in the usual wholesale quantities, and in the ordinary course of trade, for exportation to the United States. There is no other evidence in the record tending to support the claim that the entered values are the correct dutiable values.

Each of these findings has been assigned as error by the appellant herein.

It is at once manifest that the findings of the court below with respect to the probative value of the affidavit, collective exhibit 1, rest upon two bases: (1) That the affidavit is entitled to little weight, in and of itself, because it is unsupported by price lists or other evidences of sales or offers to sell. (2) That its probative value had been impaired or destroyed by other and contradictory evidence.

Obviously, the findings of the court below were especially made with reference to that part of the affidavit in which statements directly concerning the elements of value, as defined in the statute, are made, viz:

The respective prices stated on the consular invoices for the merchandise therein described, were at the time of each shipment, the market value or the price at those times for exportation of such merchandise to the United States or for sale in Havana, Cuba, which is the principal market in Cuba. Said merchandise was freely offered for sale by me to all purchasers in the ordinary course of trade in the usual wholesale quantity.

With respect to the first base upon which the court below found, we are satisfied that the court erred in applying an incorrect proposition of law to the situation. It is apparent that the court below considered the cases cited by it as supporting the proposition that in order to entitle statements such as those quoted above, when made in affidavits, to such probative value as would cause them to be accepted as proof of the facts at issue, they must be supported or corroborated by other evidence. None of the cases cited stand for that proposition, and we do not understand that to be the law on the subject.

The nearest any of the cases cited comes to the proposition as stated is found in the opinion of the Court of Customs and Patent Appeals in the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093. In that case, one Moncrieff made a statement in an affidavit that sales made "to retail firms who are selling only to users * * * are not sales in the usual wholesale quantities and in the ordinary course of trade." Of this statement, our appellate court said:

It is true that the affidavit of said Moncrieff states that sales to retailers for resale are not in the usual wholesale quantities, but this is merely a conclusion by him, drawn from the facts set out in detail in his affidavit. While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.

Accompanying the affidavit in the cited case were tabulations and summaries of sales which constituted the facts upon which affiant Moncrieff made his statement characterizing sales to retailers for resale as not in usual wholesale quantities. Upon the basis of these tabulations and summaries of sales, our appellate court and the appellate division of this court came to a different conclusion than did the affiant, and upon this presentation of the situation, the courts held that they were not bound by the affiant's statement.

Far from enunciating the proposition that such statements, standing alone, have no weight, our appellate court said—

* * * a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact * * *.

—and we think that the situation in this case furnishes an example of the circumstances contemplated by the foregoing language of the court.

We assume that the fact that the proffered evidence was in the form of an affidavit is not the basis for the holding of the court below. The statute, 28 U. S. C. § 2633, by permitting the admission in evidence of affidavits, removes the chief objections to the admission thereof—that they are themselves written hearsay and do not provide opportunity for cross-examination. An examination of collective exhibit 1 shows that the witness states that he was a merchant of some 35 years' experience in dealing in Chinese foodstuffs in Havana both for home consumption and for export to the United States. He was, therefore, qualified to make the statements contained therein referable to that experience. The statements in question purport to refer to the value of merchandise such as that here involved, and were therefore material and relevant to the issues in the case.

It is true that the statements are couched in the verbiage of the valuation statute, and refer to "market value," "price," "principal market," "freely offered for sale," "all purchasers," "ordinary course of trade," and "usual wholesale quantity." It is also true that as given in the affidavit they are conclusions of fact or statements of ultimate facts in that they set forth the final and resulting facts upon which the law of the case is to be applied. In a very substantial sense, however, they are also evidentiary facts in that they represent the direct statements of the witness of what he observed in his experience in the market for such goods.

Whether they be regarded as statements of ultimate facts or as evidentiary facts, we are of the opinion that they are admissible in cases of this nature as *prima facie* evidence, i. e., "that which standing alone, unexplained or uncontradicted, is sufficient to maintain the proposition affirmed." [1] The so-called "Opinion Rule" [2] is not so ironclad as to operate without exception in every case, and we believe that in valuation cases before this court, when the proper circumstances are shown to exist, application of judicial discretion in permitting a witness to state conclusions of fact is warranted. In valuation cases, the inquiry is as to the existence and amount of a value, and the factual elements involved as delineated in the statute are, in themselves, often within the experience and observation of witnesses.

We think the situation in this case, as shown by the stated experience of the affiant, established a proper foundation for the admission of the statements of the affiant concerning the statutory elements of value as *prima facie* evidence of the facts sought to be proved. In

---

[1] Jones, The Law of Evidence in Civil Cases, 4th ed., § 8.

[2] Op. cit. § 359; Wigmore, A Treatise on the Anglo-American System of Evidence, 3d ed., Vol. 7, § 1917, et seq.

the case of *United States* v. *Trenton Potteries Company*, 273 U. S. 392, 47 Sup. Ct. 377, 71 L. ed. 700, 50 A. L. R. 989, it was said by the Supreme Court of the United States:

A certain latitude may rightly be given the court in permitting a witness on direct examination to testify as to his conclusions, based on common knowledge or experience.

and reference to the authorities cited by the Court for comparison with that statement, *Erie R. R.* v. *Linnekogel*, 248 Fed. 389, and 2 [Vol. 4, 2d ed.] Wigmore, § 1929, indicates the soundness of the view.

The evidence offered on behalf of the defendant herein was directed along two lines: (1) Impeachment of the credibility of the affiant in plaintiff's collective exhibit 1, and (2) refutation of his statements concerning value by the production of evidence tending to support the values found by the appraiser.

The effort of the defendant with respect to impeachment of the credibility of the affiant in collective exhibit 1 was directed toward showing that the affiant had, on other occasions, made statements which were inconsistent with the statements made in the affidavit. Defendant's exhibits 2, 3, 4, 5, and 6 are reports of Treasury representatives which were received in evidence over objection of counsel for the plaintiff as to materiality and relevancy. Unfortunately, the defendant was not compelled to abstract the same and point out specifically the parts of the said reports upon which reliance was placed, and as a result the court below and this court have been unnecessarily and improperly burdened by the task of examining voluminous material, only a relatively small portion of which has any bearing upon the matter at issue.

For example, defendant's exhibit 2 consists of a report, dated March 20, 1945, of Treasury Representative Wilson C. Beers, as to an investigation made by the said Beers at the place of business of Enrique Wong Chong, the affiant of plaintiff's collective exhibit 1, on February 8, 9, 11, and March 5 and 6, 1945. The report consists of 16 pages of closely spaced typewritten material, to which are appended what purport to be copies of 106 invoices written in the Chinese language (for which no translations were supplied), a page of data regarding certain checks, and 3 pages of excerpts from invoices, apparently for the most part relating to merchandise of types other than those here involved, exported at times apparently not material to the issues herein.

Furthermore, the report is written in long and tedious sentences, one such sentence running nearly a page and a half of closely spaced typewritten material. The general effect of the report and the material attached thereto is obscure, and the evidentiary effect and relation to the issues involved of its parts have not been pointed out to the court. It may very well be that such reports are proper and adequate for the purposes of the administrative branch of the Government, but

when the matter reaches the stage of litigation, it would seem that the party offering the same should be required to specify the parts relied upon and to omit irrelevancies.[3]

So far as it appears to be relevant to the issues here in question, defendant's exhibit 2 deals with the alleged facts that during the course of the interviews with Mr. Chong, he is said to have admitted to a Treasury representative certain irregularities in the method of invoicing shipments to the importer herein. From the record it appears that Mr. Chong was a Chinese who did not speak, write, or read English; that he spoke some Spanish but did not read or write that language; and that he was at home only in the Chinese language. It also appears that because of these facts and the fact that he was unfamiliar with and confused by American customs procedure, he turned over to a local forwarding agent and customhouse broker the task of preparing the consular invoices from Spanish translations of the commercial invoices, which were in Chinese, which Spanish translations were further translated into English for the purpose of making out the consular invoices.

The irregularities which Chong is said to have admitted involve the more formal aspects of invoicing, such as the report of home market prices, and the report of orders placed covering the shipments, and do not, of their nature, contradict any material part of the statements given in the affidavit, collective exhibit 1, and, in view of the explanation of Chong's unfamiliarity with our language and invoicing requirements, do not impeach his credibility. On the contrary, to his credit, the report shows that Mr. Chong extended great aid to the Treasury representative and apparently permitted to the Treasury representative access to everything within his power, including his banking arrangements.

Defendant's exhibit 3, which is a report, dated March 26, 1945, by Treasury Representative Beers, is marked "informal" and appears to be related largely to the question of payments made by the importer to Mr. Chong, and suggests certain lines of investigation relative thereto. The final paragraph of the report accuses Chong of the criminal violation of the finance and income tax laws of the Republic of Cuba and suggests that he might be a party to false and fraudulent invoicing. It should be stated at this point that the reports are replete with innuendo, suggestions, and accusations as to wrongdoing by Mr. Chong, none of which are proper evidence in respect to the matters and issues before the court, including the matter of the credibility of Mr. Chong.

Defendant's exhibit 5 is a report, dated January 17, 1946, by Treasury Representative Dillon, the crux of which is contained in a sworn statement attached thereto and marked exhibit "B," signed and

---

[3] Compare rule 75 (e) of the Rules of Civil Procedure.

sworn to by Enrique W. Chong on January 14, 1946. In the said statement, Chong purportedly admits (1) that the prices shown in the consular invoices are those at which he actually purchased the merchandise; (2) that he received, in addition to the said purchase price, a commission from the importer as buying agent; and (3) that he sold merchandise such as that covered by certain of the consular invoices here involved at or about the dates thereof at prices higher than shown thereon.

Defendant's exhibit 4 is a report, dated November 7, 1946, by Treasury Representative Dillon stating that on November 4, 1946, Mr. Chong repudiated the sworn statement of January 14, 1946, on the ground that it was incorrect and that he did not understand what he was signing. Attached to the report is the sworn statement of Frank J. Valdes, a Spanish interpreter-translator in the office of the United States Treasury Representative in Charge at Havana, to the effect that he acted as interpreter during the interview on January 9 and 11, 1946, wherein the data contained in the repudiated statement were obtained from Mr. Chong. Mr. Valdes states that on January 14, 1946, Mr. Chong brought his own Spanish interpreter to the office of the Treasury representative and that the statement, which had obviously been prepared by the office of the Treasury representative, was translated and explained to Chong in the Spanish language by his own interpreter, and by Mr. Valdes.

Attached also to exhibit 4 is the sworn statement of the American vice consul at Havana to the effect that he (the vice consul) was thoroughly familiar with the Spanish language and that before permitting Chong to sign the statement of January 14, 1946, he translated the same from English to Spanish and discussed the various points in the statement with Chong, who stated that they were true and correct and in conformity with the facts and that he had no objection to signing the statement.

It does not appear that Mr. Chong was accorded the privilege of bringing his own interpreter at the time of the interview of January 9 and 11, 1946, at which time the data were said to have been secured from which the repudiated statement was prepared by the Treasury representative. The circumstances of that interview, and what might have impelled Mr. Chong to agree to sign the statement, all of which would seem to be very material in view of what later transpired, are not set forth in the reports offered. Upon the state of the record and in view of the obvious language difficulties, it cannot be said that Mr. Chong was not justified in repudiating the statement, and we are of the opinion that his credibility was not impeached thereby.

In our view, the defendant failed to impeach the credibility of the affiant of plaintiff's collective exhibit 1, and the plaintiff thereby established a *prima facie* case in favor of the entered values. To meet

the burden by supporting the appraised values, the defendant offered the testimonial evidence of 5 witnesses and 12 documentary exhibits.

The first of defendant's witnesses was Mr. Wah Lee, manager of Tuck High Co., importer and dealer in foodstuffs of the kind here involved. Mr. Lee stated that he saw an advertisement in Cuban newspapers of one Chiong Lee, showing that he manufactured products of the type involved, and that Mr. Wah Lee wrote to Mr. Chiong Lee for quotations, in response to which he received a document in the Chinese language.

It should be noted that according to defendant's exhibit 6, a report of Treasury Representative Dillon, dated June 10, 1947, and plaintiff's collective exhibit 12, an affidavit of Enrique W. Chong with attached invoices, it would appear that the name Chiong Lee was a trade name under which Cuan Chon, shown to have been the manufacturer of at least part of the merchandise here involved, operated.

Mr. Wah Lee testified that the document in the Chinese language was a price list of Chiong Lee which he (Wah Lee) received in 1944, and, after stating that he read and wrote Chinese, stated that a photostat in English headed "Chiong Lee Price List Sent to Tuck High Co. dated 2/2/44" with 16 items thereon was a correct and fair translation of what appears in the Chinese price list. The Chinese and English documents were received in evidence as defendant's collective exhibit 7. It should be noted that it later developed that the Chinese document was not dated 2/2/44, but 2/2/34, and that the English translation was only partial.

Mr. Wah Lee then testified that after receiving the price list, he purchased merchandise listed therein and identified a consumption entry numbered 734436, dated May 17, 1944, as covering a shipment of merchandise purchased pursuant to the price list. The entry and accompanying papers were received in evidence as defendant's exhibit A over the objection of counsel for the plaintiff that the merchandise covered by exhibit A was not identified with the merchandise at bar as to quality, and the witness testified that the prices shown on the entry and on the price list were the prices actually paid for the merchandise.

On cross-examination, the witness testified that except for obtaining the price list, he never dealt with Chiong Lee, but ordered from and was billed by and paid his broker. He was not able to say that the items covered by exhibit A had definitely come from Chiong Lee, and testified that soy sauce came in different qualities at different prices; that different manufacturers of fruit sauce used different fruits; and that he never saw the merchandise here involved and did not know if it was the same as his.

Mr. Jin Say Ding, a partner in the firm of Sun Kwong On Co., merchant of Chinese foods, testified that during the late war he, in his capacity of member of the firm in charge of purchasing, bought

various shipments of salted, dried soy beans covered by consumption entries Nos. 730362, 713149, 726050, and 734952, dated 6/10/43, 11/1/43, 2/29/44, and 5/23/44, respectively. These entries and their accompanying papers were received in evidence over the objection of counsel for the plaintiff that there was no showing that the merchandise covered thereby was similar in quality and grade to the merchandise here involved, and were marked defendant's exhibits B, C, D, and E, respectively.

On cross-examination, the witness testified that all of the merchandise was bought through a firm of dealers in Havana and that he did not know who the manufacturer of the merchandise was, nor did he know positively that the quality was the same in all four shipments although the price varied somewhat.

The examiner in the appraiser's office who passed the merchandise here involved was called to testify on behalf of the defendant, and the court below has summarized his testimony with respect to the identity or similarity of the merchandise here involved and that imported by Tuck High Co. and Sun Kwong On Co. as follows:

Mr. Herbert Marks, examiner of Chinese-type foodstuffs, testified that he had examined the merchandise herein and that imported by Tuck High Co. and Sun Kwong On Co., and that in his opinion the fruit sauce, plum sauce, bean sauce, and bamboo shoots involved herein and those involved in the Tuck High entry were made of the same material and had the same value and use; and that the soy beans in the Sun Kwong On entries and those involved herein were of the same value and use.

While Mr. Marks was cross-examined at great length in an effort to break down his qualifications, no evidence was offered tending to show that the merchandise imported by Tuck High Co. and Sun Kwong On Co. was of any different character than that involved herein.

The examiner, Mr. Marks, was permitted to give his opinions as stated by the court below over the objections of counsel for the plaintiff that he was not qualified, either as an expert or as an ordinary witness testifying from experience, to testify as to identity or similarity of the merchandise here in question and that involved in the Tuck High Co. and Sun Kwong On Co. shipments, and the action of the trial court in so doing is assigned as error.

On cross-examination, counsel for the plaintiff established that the basis of Mr. Marks' experience with merchandise of the kind here involved was limited to his observation and examination of shipments of imported merchandise of the kind here involved; that he did not know how any of the merchandise was made; that as to the fruit and plum sauces, he did not know what fruits were contained in the fruit and plum sauces or whether each shipment contained the same or different fruits; that as to soy sauce he "did not have similar merchandise from other shippers" and the item did not appear on the price list (collective exhibit 7) and that he "appraised it at the value

of some of the other items that appeared on the others" (whatever that may mean); and that he could not identify the cut (and, hence, the quality) of the bamboo shoots involved.

It must be remembered that the nub of this witness' testimony was—

\* \* \* that *in his opinion* the fruit sauce, plum sauce, bean sauce, and bamboo shoots involved herein and those involved in the Tuck High entry were made of the same material and had the same value and use; and that the soy beans in the Sun Kwong On entries and those involved herein were of the same value and use. [Italics added.]

The basic defect in the evidence hereinbefore reviewed in connection with the Tuck High and Sun Kwong On shipments and their claimed identity with the merchandise here involved is that there is no presumption and no showing that the values at which the merchandise covered by those shipments was entered and appraised met the statutory requirements as to value, and were the correct values of the merchandise, and the fact that such merchandise was appraised as entered does not, in and of itself, establish the necessary facts as to value thereof. See *Sears, Roebuck & Co. et al.* v. *United States*, 31 C. C. P. A. 36, 42–43, C. A. D. 246.

This is particularly true as to the Sun Kwong On shipments as to which none of the circumstances of purchase were given in the record other than that Mr. Ding had bought the same. The situation as to the Tuck High shipment is virtually the same, for there, the correctness of the values at which the merchandise was entered and appraised depends upon the price list and translation thereof, collective exhibit 7.

It is interesting that when the price list in the Chinese language was translated in open court by an interpreter, whose qualifications were conceded by both parties, it was determined that the actual date expressed in Chinese thereon was "second day, second month, 1934," about 10 years prior to the time of the importations here involved. There is ample evidence in the record that the prices of the various commodities involved fluctuated from time to time, and there is no direct, positive evidence that the prices shown on the price list represented the prices at which such merchandise was freely offered for sale in the principal markets of Cuba under the conditions set forth in the statute at or about the time of the importations here involved. We are of the opinion that the price list and partial translation thereof, defendant's collective exhibit 7, were irrelevant because of remoteness, and that the motion to strike the same on that ground should have been granted.

It will be seen, therefore, that witness Marks' opinion as to the value of the merchandise here in question was based upon the assumption that the values at which the Tuck High and Sun Kwong On shipments were entered and appraised represented the correct values thereof

within the meaning of the valuation statute, a fact which was by no means established or conceded at the trial. In these circumstances, Mr. Marks' opinion as to value loses whatever probative value it might have had as the expression of an ordinary or nonexpert witness under other circumstances.

We observe, also, that Mr. Marks' knowledge, as revealed by his testimony, as to the materials of which the items involved were composed, and their use, was not such as would qualify him to testify as to identity or similarity in those matters.

We now proceed to a consideration of the remaining item of documentary evidence offered on behalf of the defendant. This involves what is apparently relied on by the defendant as an admission on the part of a responsible member of the plaintiff firm that prices higher than those at which certain of the merchandise was invoiced and entered were paid to Enrique W. Chong.

It appears that on May 24, 1944, at the request of Mr. Marks, Mr. Koon Leong and Mr. Soon Leong, partners in the plaintiff firm of Mon Fong Wo Co., came to Mr. Marks' office in the United States Appraiser's Stores Building. Present also were Mr. Harry Lewis and Mr. William H. Konin, both examiners of merchandise. As Mr. Koon Leong did not speak English very well, Mr. Lewis acted as interpreter during the oral examination. According to the testimony of Mr. Marks, he asked Mr. Leong—

\* \* \* if he would write to me and send me and let me know what prices he paid for the bamboo shoots or shavings when he got back to his office—

—and that in response thereto, he received through the mails a document offered and received in evidence as defendant's collective exhibit 8. The document reads as follows:

We pay Chong

1 lb.    Bamboo Shoot @  .30
4½ lbs.     "      "   @ 1.00

Soon Y Leong

On cross-examination, it was brought out that as originally received the document read—

1 lb.    Bamboo Shoot @  .30
4½ lbs.     "      "   @ 1.00

and, according to Mr. Marks' testimony, he personally went to the place of business of the importer and advised him that the document as received was "not satisfactory"; that there should be an indication that payment was made and to whom; and that it should be signed. According to Mr. Marks' testimony, after consultation between the Leongs, Mr. Soon Y. Leong added the words "We pay Chong" and signed the document.

Mr. Soon Y. Leong, appearing as a witness on behalf of the plaintiff, disputed the account given by Mr. Marks. Mr. Leong's version was that he was asked by Mr. Marks what the retail selling price of the bamboo shoots was and that that was what appeared on the paper originally; that later he was called to Mr. Mark's office and that Mr. Marks "said we paid that much to Chiong" and that "we pay Chiong that much or we get the Government agent after you," and that under such circumstances he, Soon Y. Leong, wrote the added words and signed the paper.

In our view, it makes no difference which version of the matter is correct for the reason that we are satisfied that the exhibit and the evidence of either version of the surrounding circumstances are too vague, uncertain, and unconnected with the shipments here involved to be probative of any material fact in connection with the value thereof. Certainly, the import of the writing itself is ambiguous and it is not, of itself, connected to the importations at bar, and this ambiguity is not resolved by the evidence offered as to the circumstances under which it was made. It, therefore, cannot be accepted as an admission against interest by the importer, and if it was offered as direct evidence in support of the appraised values, it has no such effect for the appraised values themselves bear no relation to the prices shown on the exhibit.

A review of all of the evidence offered on behalf of the defendant is convincing that the burden of refuting the *prima facie* case established by the plaintiff was not met. On the contrary, there is ample evidence that there are various grades and qualities of each of the products involved, resulting from the nature and quality of the materials and methods used in their preparation, and that the price of the ultimate products depends upon the grade and quality thereof. It is conceded by the defendant herein that part of the merchandise covered by each entry was, after entry, later condemned and seized by the Food and Drug Administration and destroyed. This evidence tends to support the contention of the plaintiff that the merchandise involved was of the poorer qualities, and, consequently, of lesser value than merchandise of the same type but of higher quality.

Upon the entire record we find as facts:

(1) That the merchandise involved consists of spiced, salted soy beans (cooked black beans), soy bean sauce, plum sauce, fruit sauce, and bamboo shoots or sauce exported from Cuba during the period from December 21, 1943, to April 19, 1944.

(2) That at the time of exportation of the involved merchandise, the price at which such merchandise was freely offered for sale to all purchasers in the principal markets of Cuba for home consumption or for exportation to the United States, in the usual wholesale quanti-

ties and in the ordinary course of trade, plus the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, was the invoiced and entered value in each instance.

We conclude as matters of law:

(1) That the proper basis of value of the merchandise here involved is foreign or export value, as those values are defined in section 402 (c), as amended, and (d) of the Tariff Act of 1930, and

(2) That such values were the same in each instance and were the invoiced and entered values.

The decision and judgment of the single judge are, therefore, reversed.

### DISSENTING OPINION

Cole, Judge: *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093, as discussed so importantly in the majority opinion, stands for the proposition that a witness' statements, which are mere conclusions, have no weight in the light of other evidence disproving the alleged facts. The majority opinion applies a different interpretation thereto from which views I respectfully dissent. There is, in this record, other credible evidence in such abundance I cannot overlook it. The following is in that category.

Treasury agents' reports, exhibits 2, 3, 4, 5, and 6, part of appellee's (defendant's) case, outline in much detail the many ramifications of the Cuban shipper's business and his relationship with the importer of the merchandise in question. Irregularities in invoicing are disclosed. Neither accounting records nor correspondence files concerning transactions with the importer were maintained by the shipper, so, as stated in the report, exhibit 2, *supra*, "it was impossible to determine or establish whether the unit selling prices and total invoice amounts shown on the consular invoices were correct or otherwise." Failure of the shipper to enter his transactions with the importer in the "firm's regular books of account constitutes a criminal violation of the finance and income tax laws of the Republic of Cuba," exhibit 3. While none of those conditions may have a direct bearing in finding values of the products under consideration, they serve in this controversy to accentuate the rather unusual course of trade between the Cuban exporter and the New York importer of the present merchandise.

Treasury agent's report, exhibit 2, is particularly informative in revealing the business practice of Enrique Wong Chong, the shipper. The report is dated March 20, 1945, and is based on interviews had with the said Enrique Wong Chong on "February 8, 9 and 11, and March 5 and 6, 1945." Following is a résumé thereof, so far as pertinent.

Enrique Wong Chong is not the manufacturer of the merchandise in question. Nor is he in any way associated with the manufacturers thereof, from whom he purchases on a cash basis. There are no fixed prices, all transactions being the result of bargaining, and no invoices, bills, or receipts are given by the manufacturers, except on "extremely rare occasions." Manufacturers make several different qualities of sauces, salted soy beans, and black beans, although they are not identified by any designation or quality number. No records are kept from which to establish identities of manufacturers of any particular lot of merchandise exported by this shipper.

Business relations between the Cuban shipper and the importer have existed over a period of several years. They began through a message from the importer requesting that "he (Enrique Wong Chong) send the firm of Mon- Fong Wo Company, New York City, any merchandise he thought particularly suitable for the Chinese trade in New York whenever any such merchandise might be available from his firm for export to Mon Fong Wo Company, New York City." All details concerning qualities, quantities, and prices were entirely within "the judgment and discretion of the firm of Enrique Wong Chong, Havana"; and all sales to the importer "during the course of the past several years, were made on the aforementioned basis." The importer never places any special orders. All sales emanate from the shipper, acting on his "own volition," and "in accordance with the original message of instruction received from the importer several years ago."

Sales and offers for sale of merchandise, such as or similar to that under consideration, for export to the United States, by the shipper of the products in question, are limited to the importer herein. The restriction is expressed as follows (exhibit 2, *supra*):

Mr. Enrique Wong Chong stated that although the firm is not bound by any written or oral contract, agreement or understanding with the importer to confine or in any way restrict any sales and deliveries of any merchandise, which it may make for export to the United States, to the firm of Mon Fong Wo Company, New York, the firm has never sold, and will not sell, merchandise identical or similar to any of the articles comprising the particular shipments under investigation, identical or similar to any other articles of merchandise it sells and ships for export to Mon Fong Wo Company, New York, or any other merchandise whatsoever, for export to any firms or buyers in the United States other than Mon Fong Wo Company, as a matter of policy established by himself entirely on his own volition; * * *.

Sales for home consumption of merchandise, such as or similar to that in question, are made by the shipper of these products "directly to actual consumers over the counters of its retail store in Havana, on a cash sales basis of which no detailed records are kept."

Treasury agent's report, exhibit 5, bearing date of January 17, 1946, states that the Cuban exporter keeps a ledger account, showing "only transactions with Mon Fong Wo Company," and then observes

that this practice began after the investigation which is reported in exhibit 2, *supra*.

In the light of the Government's proof, as hereinabove outlined, plaintiff's (appellant's) affidavit, collective exhibit 1, as it employs language used in tariff definitions of foreign and export values, is a collection of conclusions, not conformable with statutory requirements. The Cuban exporter's arrangement with the present importer was an exclusive one and, therefore, does not determine the issue herein. If statements made in the affidavit are to be attributable to transactions with others, appellant should have offered additional proof to meet its burden as plaintiff. That there were other exporters, is shown in plaintiff's (appellant's) affidavit, collective exhibit 12, wherein the shipper testified that he knows of other wholesalers in Havana that exported to the United States. The omission of evidence from others in the country of exportation is an added and serious deficiency in appellant's proof. *United States* v. *International Forwarding Co., Inc., A/C Ozalid Corporation*, 27 C. C. P. A. 21, C. A. D. 56.

Plaintiff-appellant, having failed to overcome the presumption of correctness attaching to the appraised values, the judgment rendered by the trial judge should be affirmed. Accordingly, I dissent from the views expressed by the majority.